IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Lamont Cutner,<br><br>          Plaintiff,<br>     v.<br><br>Joseph Canning, Dwayne Hingleton, Christopher Campisi, Ofc. Brown, Raycharm Burkett, Lt. Ramp, Let. Delk, Miles Perkins, Anthony Jones, Steven Fleshman, and Franklin Miller<br><br>  Defendants. | Case No. 6:23-cv-2534-RMG<br><br>**ORDER AND OPINION** |

This matter is before the Court on the Report and Recommendation ("R & R") of the Magistrate Judge, recommending the Court grant-in-part and deny-in-part Defendants' motion for summary judgment. (Dkt. No. 112). Defendants object to the portions of the R & R recommending the denial of their motion for summary judgment. (Dkt. No. 115). For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

**I.     Legal Standards**

  **A. Eighth Amendment Standard**

It is important at the outset to set forth the proper legal standards for addressing an Eighth Amendment claim asserted by a prisoner who has engaged in disruptive conduct that threatens the safety of prison staff. It is well settled that where prison officials determine the need to use some level of force "to preserve internal order and discipline," they are accorded "wide-ranging deference in the adoption and execution of policies and practices" necessary to "maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). This deference does not extend to conduct by prison officials that involves "the unnecessary and wanton infliction of pain." *Ingraham v. Wright*, 430 U.S. 651, 670 (1977). Where prison officials find it necessary to exercise

1

some use of force to restore order and protect inmates and staff, the question then turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-321 (1986) (*citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*. at 319.

In order to recover on an Eighth Amendment excessive force claim, a plaintiff must establish that a "prison official acted with a sufficiently culpable state of mind (subjective component); and [that] the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citation and internal quotation marks omitted).

For the subjective component, the Supreme Court in *Whitley* identified various relevant factors to determine whether the actions of prison officials in addressing disruptive inmate conduct that threatened the safety of prison staff or other inmates constitutes malicious or sadistic conduct:

> (1) The need for the application of force; (2) the relationship between the need and the amount of force that used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

475 U.S. at 321.

**B. Report and Recommendation Standard**

This matter comes before the Court following the issuance of an R & R of the Magistrate Judge and objections submitted by Defendants. The Magistrate Judge's R & R was submitted in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 for the District of South Carolina. The Magistrate Judge makes only a recommendation to this court. The recommendation

has no presumptive weight. The responsibility to make a final determination remains with this court. *See Mathews v. Weber,* 423 U.S. 261, 270–71 (1976). The Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objections are made, and the court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. *See* 28 U.S.C. § 636(b)(1).

### C. Summary Judgment Standard

Defendants have moved for summary judgment regarding all of Plaintiff's claims. Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

## II. Factual Background

Plaintiff, a state prisoner currently serving a life sentence, brought this case against numerous employees of the South Carolina Department of Corrections, alleging that Defendants are liable, in their individual and official capacities, for violating Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. (Dkt. No. 31 at 2-4).

During the incident that gave rise to Plaintiff's claim, Plaintiff was housed in the Secure Mental Health Unit at SCDC's Broad River Secure Facility. (*Id.* at 5-6). While housed there, Plaintiff threw a container of feces out of the food flap of his cell door at Mental Health Officer Miller, striking him. (Dkt. Nos. 101-1 at 1-2; 101-2 at 1). Security staff then contacted Qualified Mental Health Professional Lowder to attempt to deescalate the situation (Dkt. No. 101-6, ¶ 3). According to Lowder, Plaintiff was "very agitated and would yell profanities and demanded that the team come in the cell and get him, because he was not coming out." (*Id.*, ¶ 4). The area around the cell "smelled strongly of feces" and Lowder was unable to deescalate the situation. (*Id.*, ¶¶ 3, 4).

Associate Warden Canning was informed that Plaintiff had thrown feces on Defendant Miller and watched the video footage of this incident. (Dkt. No. 101-5, ¶ 2). Defendant Canning also learned that the food flap on Plaintiff's cell door could not be securely closed and that feces was on the floor and elsewhere in the cell. (*Id.*, ¶ 4). Defendant Canning was also informed that Plaintiff "refused to come out of his cell and demanded that a team be assembled to come and get him." (*Id.*, ¶ 7). Based on this information, Defendant Canning authorized the implementation of the department's forced cell extraction policy because Plaintiff "had refused attempts to get him to exit his cell, he had acted violently by throwing bodily fluids at another officer, he had displayed signs of imminent danger to himself and others, and his actions presented a threat to the security

and safe order of the institution." (*Id.*, ¶8). Defendant Canning authorized the forced extraction of Plaintiff from his cell and provided the authorization to Captain Hingleton to proceed. (*Id.*, ¶ 8).

Defendant Hingleton assembled a cell extraction team and directed that they remove Plaintiff from his contaminated cell and place him in a controlled cell. (Dkt. No. 101-7 at 1-2). Under department procedures, individual members of the extraction team were assigned a particular limb of the inmate so that the team could rapidly gain control of the inmate and extract him from the cell. The operation was recorded on video. (Dkt. No. 101-8). The team approached Plaintiff's cell and instructed him to go to the back of his cell. (*Id.* at 02:35). Defendant Hingleton stated in an incident report that Plaintiff was told to back away from the door because he was displaying a bowl of feces. (Dkt. No. 107 at 1). Defendant Hingleton further stated that Plaintiff refused to back away from the door. (*Id.* at 1-2). Defendant Hingleton then ordered the extraction team to make entry. (Dkt. No. 101-8 at 02:35).

Lieutenant Ramp was the designated "shield officer," whose duty was to enter the inmate's cell first and to push the inmate away from the door. (Dkt. No. 105-1 at 2). As Defendant Ramp explained, "[t]his movement must be done quickly to prevent the inmate from being able to fight back which could cause injuries to the officers and the inmate. The other members of the team must enter the cell quickly and immediately behind the shield man so they can grab and restrain their respective assigned body part." (*Id.*) Defendant Ramp described the initial stage of the cell extraction process as "very hectic" but necessary to "immediately take control of the situation and get an inmate restrained immediately." (*Id.*)

Defendant Ramp stated that upon entry into the cell he promptly moved toward Plaintiff with the shield and pushed him back toward his bunk. (*Id.* at 7). Defendant Ramp further stated that the shield made contact with Plaintiff and pushed him down onto his bunk, as Ramp was

5

trained to do. (*Id.*) Defendant Ramp stated that, after Plaintiff was fully restrained, he noticed that Plaintiff had a cut above his right eye. (*Id.*) Ramp stated he had no idea how the cut occurred but stated that he had not "knowingly hit him with the shield above his eye." (*Id.*)

Another member of the extraction team, Sergeant Jones, stated in his sworn declaration that he was assigned to restrain Plaintiff's right leg during the forced cell movement and that after getting control of Plaintiff's leg he was handed leg irons that he then placed on Plaintiff. (Dkt. No. 101-12, ¶¶8-10). The video depicts Defendant Jones as one of the last members of the extraction team to enter Plaintiff's cell. (Dkt. No. 101-8 at 02:35).

Plaintiff alleges that when the Defendants entered his cell he was not resisting and was lying face down on his bunk with his hands behind his back. (Dkt. No. 105 at 1, 4). Plaintiff contends that Ramp entered his cell and intentionally hit him in the head with the shield, leaving him with a gash that required staples. (*Id.* at 2). Further, Plaintiff alleges that Jones hit him twice in the face and head with the leg irons giving him two black eyes before placing the leg irons on Plaintiff's legs. (Dkt. No. 108 at 4). Plaintiff alleges that Lieutenant Campisi, who was the camera operator, positioned the camera so that other officers' bodies blocked the camera's view of the assault. (*Id.* at 3). Additionally, Plaintiff filed inmate witness statements that state Plaintiff was assaulted with excessive force. (Dkt. No. 109 at 1, 4).

Plaintiff alleges that Defendants Ramp and Jones hit him and that Defendants Brown, Delk, Hingleton, Perkins, and Miller saw Ramp and Jones assault Plaintiff but did nothing to stop the assault. (Dkt. No. 105 at 5). Plaintiff also contends that Defendant Canning told his staff to intentionally assault Plaintiff. (Dkt. No. 31 at 9). Plaintiff also alleges that Defendant Baylor caused this injury by leaving the food flap unsecured, which started the incident. (*Id.* at 6).

The video of the cell extraction operation, which takes a little over one minute, shows the rapid entry of the various members of the extraction team and their successful extraction of Plaintiff from the cell. (Dkt. No. 101-8 at 02:35-04:15). Because of the small confines of Plaintiff's cell and the participation of the five members of the extraction team in the operation, it is difficult to see on the video the details of the brief encounter with Plaintiff. (*Id.*) What is discernable on the video is that each member of the extraction team took assigned positions immediately after entering the cell, communicated in a calm voice with each other throughout the brief operation, and successfully extracted the Plaintiff. (*Id.*) As Plaintiff was being removed, the video shows he was plainly resisting as he stated over and over he was not resisting. (*Id.*)

Defendants filed a motion for summary judgment. (Dkt. No. 101). The Magistrate Judge issued an R & R recommending this Court grant-in-part and deny-in-part Defendants' motion. (Dkt. No. 112). Defendants objected to the portions of the R & R recommending the denial of their motion for summary judgment. (Dkt. No. 115). The matter is now ripe for the Court's review.

### III. Discussion

#### A. Individual Capacities

##### 1. Defendant Ramp

The Magistrate Judge concluded that there was a genuine issue of material fact concerning Defendant Ramp's subjective state of mind when he participated in the extraction of Plaintiff from his cell. (Dkt. No. 112 at 12). Defendants filed an objection to this conclusion, arguing that a proper application of the *Whitley* standards with this record establishes that there was no Eighth Amendment violation.

The Court has reviewed *de novo* the record in light of the *Whitley* factors as well as the well-established summary judgment standards. The Court is mindful that "prison internal security is peculiarly a matter normally left to the discretion of prison administrators," who "should be

accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321-322.

Defendant Ramp was assigned the duty of the "shield officer," whose role necessarily involved physical contact with the disruptive inmate who was unwilling to voluntarily exit his cell. The shield in this instance involved protection of the officer from both physical assault by the inmate as well being struck by the bowl of feces allegedly being held by the inmate. Plaintiff sought and demanded a physical confrontation with the extraction team. He now seeks to hold the first officer liable for entering his cell and using the shield as the first contact with the inmate. Physical contact between the resisting inmate and the shield of the first entering officer is almost a given in this situation.

Under the first *Whitley* factor, the need for the application of force, the record firmly establishes the critical need to extract Plaintiff from his cell. The cell and surrounding area reeked with feces and created an unsanitary condition. The food flap could not be secured, exposing staff and others to further assault by Plaintiff with feces. The record establishes a deliberate and reasoned process leading to the entry into Plaintiff's cell only after deescalation efforts failed. Plaintiff insisted on the summoning of the extraction team, making it necessary under these circumstances for the application of force to facilitate Plaintiff's extraction from his cell. This factor weighs decisively in Defendants' favor.

The second *Whitley* factor, the relationship between the need and amount of force used, also weighs in favor of Defendants. The entire extraction operation took a little more than a minute to successfully remove Plaintiff from his feces laden cell. Firm, timely, and decisive force was necessary. The operational methods utilized were the product of department policy and training

and were utilized only after a less confrontational approach failed. The fact that there was physical contact with the inmate was, again, a given and was the product of Plaintiff's insistence that he would not voluntarily leave his cell. The use of force was brief and effective.

The third *Whitley* factor, the extent of any reasonably perceived threat, weighs decisively in Defendants' favor. Plaintiff had created both a sanitary crisis and a threat to the order of the institution by throwing feces on an officer and maintaining the means to commit other similar acts since his food flap could not be closed. His cell was covered in feces and he allegedly held a bowl of feces available for further use against prison staff. The record establishes a sound basis for the Defendants' judgment that Plaintiff needed to be extracted from his cell to address this intolerable situation.

The fourth *Whitley* factor, any efforts to temper the severity of the response, was fully satisfied by the clear record evidence that prison officials initially responded to the throwing of feces on an officer by sending in a mental health staff person in an attempt to deescalate the situation. Only after this effort failed and Plaintiff demanded that an extraction team be summoned to remove him from his cell, was the department's cell extraction policy employed.

Viewing the evidence in a light most favorable to Plaintiff as the nonmoving party and applying the *Whitley* factors, the Court finds that the force utilized by Defendants was applied in good faith, in accord with department policy, and necessary to restore order to a wholly unacceptable situation. The use of force was reasonably necessary to restore order and institutional control and was exercised in a disciplined, rapid, and efficient manner. Plaintiff's actions were plainly calculated to provoke a response from prison staff that would require the use of force, and the *Whitley* standards are designed to provide prison staff the discretion and authority to act without creating a cause of action against the officers for the responsible performance of their duties. To

rule otherwise, the Court would invite inmates to engage in disruptive conduct with the purpose of manufacturing a lawsuit and would undermine the ability of prison officials to maintain institutional order. Under these circumstances, the Court finds that no reasonable jury could find Defendant Ramp's use of force was applied maliciously and sadistically for the very purpose of causing harm. Accordingly, the Court sustains Defendants' objections to the R & R and grants summary judgment in favor of Defendant Ramp as to Plaintiff's excessive force claims.

### 2. Defendant Jones

The Magistrate Judge concluded that there was a genuine issue of material fact concerning Defendant Jones' subjective state of mind when he participated in the extraction of Plaintiff from his cell. (Dkt. No. 112 at 12). Plaintiff contends that Jones, a member of the extraction team, struck him twice in his head and face with leg irons. Defendants argue that the video evidence shows that Defendant Jones did not hit Plaintiff with the leg irons.

"[A]t the summary judgment stage, video evidence can only discredit a nonmovant's factual assertions if the video blatantly contradicts the nonmovant's position." *Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir. 2024). A court considering a defendant's summary judgment motion may discount a plaintiff's first-hand account only when "[t]he videotape quite clearly contradicts" the nonmovant's version, and when a party's story is "blatantly contradicted by the record," such that "no reasonable jury could believe" the nonmovant's version in light of the video evidence. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007).

Here, the video shows that Defendant Jones was among the last staff members to enter the cell and remained at Plaintiff's feet throughout the extraction process. Further, the audio from the extraction references the need for the leg irons as Plaintiff was secured on his bunk and seconds later the locking of the leg irons can be heard. This evidence clearly contradicts Plaintiff's account

that he was struck in the face with leg irons by Defendant Jones. The Court, therefore, discounts Plaintiff's account and finds that no reasonable jury would find that Defendant Jones struck Plaintiff with leg irons in light of the video evidence.

After reviewing the full record in this matter *de novo* and applying summary judgment standards and the *Whitley* factors, the Court finds that each of the *Whitley* factors weigh in favor of Defendant Jones. As addressed in detail above regarding Defendant Ramp, there was a significant need for the application of force to extract Plaintiff from his feces laden cell, the force used was brief and in accord with department procedures and policy, the need for the use of force was reasonably perceived by Defendants, and force was utilized only after de-escalation efforts had failed. Under these circumstances, the Court finds no reasonable jury could find Defendant Jones' use of force was applied maliciously or sadistically for the purpose of causing harm. Accordingly, the Court sustains Defendants' objections to the R & R and grants summary judgment in favor of Defendant Jones as to Plaintiff's excessive force claim.

### 3. Defendants Hingleton, Brown, Delk, and Perkins

The Magistrate Judge also recommended denying Defendant's motion for summary judgment as to Plaintiff's bystander liabilities claim against Defendants Hingleton, Brown, Delk, and Perkins in their individual capacities. An officer may be liable under a Section 1983 theory of bystander liability "if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d 188, 204 (4th Cir. 2002). Because the Court found that Plaintiff's rights were not violated by Defendants Ramp and Jones, the first element is not met. Accordingly, the Court declines to adopt this portion of the R & R and grants summary judgment in favor of Defendants Hingleton, Brown, Delk, and Perkins is appropriate on Plaintiff's bystander liability claims.

### 4. Defendants Canning, Campisi, and Miller

The Magistrate Judge recommended granting summary judgment as to Plaintiff's supervisory liability claim against Defendant Canning in his individual capacity and as to Plaintiff's claims against Defendants Campisi and Miller in their individual capacities. No party objected to the Magistrate Judge's recommendation on these issues. The Court agrees with the Magistrate Judge's analysis regarding Defendants Canning, Campisi, and Miller and adopts the Magistrate Judge's R & R as to those Defendants.

### 5. Defendants Burkett and Fleshman

The Magistrate Judge also recommended granting Plaintiff's request to voluntarily dismiss Defendants Burkett and Fleshman. No party objected to the Magistrate Judge's recommendation on this issue. The Court agrees with the Magistrate Judge's analysis regarding the voluntary dismissal of Defendants Burkett and Fleshman and adopts the Magistrate Judge's R & R as to those Defendants.

## B. Official Capacities

The Magistrate Judge recommended granting Defendant's motion for summary judgment as to Plaintiff's claims against Defendants in their official capacities based on Eleventh Amendment immunity. The Eleventh Amendment prohibits federal courts rom entertaining an action against a state, which includes state officers acting in their official capacity. *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996). The Magistrate Judge reasoned that the Eleventh Amendment prohibits the Court from entertaining an action against the Defendants as state agency officers. The Court agrees with the Magistrate Judge's reasoning and finds that the Magistrate Judge correctly analyzed Defendant's motion for summary judgment as to Plaintiff's claims against Defendants in their official capacity. Accordingly, the Court adopts the R & R on the issue and dismisses Plaintiff's claims against Defendants in their official capacity.

IV.     Conclusion

For the reasons set forth above, the Court **GRANTS** Defendants' motion for summary judgment (Dkt. No. 101) and dismisses this action with prejudice.

_s/ Richard Mark Gergel_____  
Richard Mark Gergel  
United States District Judge

August 27, 2024  
Charleston, South Carolina